# United States Court of Appeals
## For the First Circuit

---

Nos. 00-2430
     00-2431

IN RE: BOSTON'S CHILDREN FIRST, ET AL.,

Petitioners.

---

ON PETITION FOR A WRIT OF MANDAMUS

---

Before

Torruella, <u>Chief Judge</u>,

Stahl and Lipez, <u>Circuit Judges</u>.

---

<u>Michael Williams</u>, with whom <u>Chester Darling</u> and <u>Robert Roughsedge</u>, were on brief, for appellants.
<u>Frances S. Cohen</u>, with whom <u>Merita A. Hopkins</u>, Corporation Counsel, <u>Diane Diianni</u>, Special Assistant Corporation Counsel, <u>Hill & Barlow</u> and <u>Adam N. Lewis</u>, were on brief, for appellees.

---

February 5, 2001

---

**TORRUELLA, <u>Chief Judge</u>.** This petition involves the difficult question of whether a sitting district court judge should have recused herself after commenting publicly on a pending matter. Because we find that it was, in this case, an abuse of discretion for the judge not to recuse herself based on an appearance of partiality, we grant the writ of mandamus. In so doing, we emphasize that such a grant in no way indicates a finding of actual bias or prejudice, nor does it suggest that the trial judge abdicated any of her ethical responsibilities.

## BACKGROUND

We briefly summarize the procedural history of the case in order to place the motion for recusal and the petition for the writ of mandamus in context.

Petitioners filed suit challenging Boston's elementary school student assignment process on June 21, 1999, claiming that they had been deprived of preferred school assignments based on their race, in violation of state and federal law. The case was assigned to District Judge Nancy Gertner. On May 19, 2000, the district court addressed a motion to dismiss in which defendants argued that "plaintiffs lack standing to sue because they would not have received their preferred school assignments anyway, even if racial preferences were not used" in the assignment formula. The district court found that five of the ten

individual plaintiffs[1] had not applied to change schools for the 1999-2000 school year, and thus lacked standing to seek injunctive relief.[2] Boston's Children First v. City of Boston, 98 F. Supp. 2d 111, 114 (D. Mass. 2000) [hereinafter Boston's Children, Standing Order].  The court allowed the remaining plaintiffs to conduct further discovery prior to determining whether they had standing.  The court found that because all of the plaintiffs "may have a claim for damages," it could not dismiss any of the damages claims on standing grounds.

Petitioners also sought class certification.  In a June 20, 2000 status conference the court indicated that it would not rule on class certification until it had received a written motion (which had not yet been submitted) that analyzed how the alleged class complied with the requirements of Federal Rule of Civil Procedure 23.  The court also offered petitioners a choice: it would either rule on their pending motion for a preliminary injunction at that time, despite the "relatively truncated record," or it would defer the motion until further discovery had occurred.  Petitioners chose to conduct further discovery, and the motion for a preliminary injunction remains pending.[3]

---

[1] The other plaintiff-petitioner, Boston's Children First, is a "self-described membership and advocacy organization."

[2] The five individual plaintiffs who were denied standing to sue for injunctive relief have pursued an interlocutory appeal which is currently pending before this Court.

[3] The district court had denied petitioners' previous motion for a preliminary injunction.  Boston's Children First v. City of Boston, 62

In a procedural order dated June 29, 2000, the district court set the course of future litigation: it would allow further discovery on the issue of standing, it would determine standing, and if any of the plaintiffs had standing, class discovery and a hearing with respect to class certification would follow. Boston's Children First v. City of Boston, C.A. No. 99-11330-NG (D. Mass., June 29, 2000) (procedural order).

Despite the schedule proposed in this procedural order, petitioners filed a motion for class certification dated July 26, 2000. The motion noted the similarity between the present case and Mack v. Suffolk County, 191 F.R.D. 16 (D. Mass. 2000), a case in which class certification had been granted prior to the resolution of standing issues. Also on July 26, the Boston Herald printed an article in which counsel for petitioners decried the district court's failure to immediately certify a class. Counsel made the provocative claim that "[i]f you get strip-searched in jail, you get more rights than a child who is of the wrong color," a reference to the facts of the Mack case. Dave Wedge, Lawyer Fights School Ruling, Boston Herald, July 26, 2000, at 5. The article said that:

> According to [counsel's] motion, Gertner refused to hear arguments to expand the school suit to a class action because the affected students may no longer have standing in the case. But in the

F. Supp. 2d 247, 248 (D. Mass. 2000) [hereinafter, Boston's Children, Denial of Preliminary Injunction].

-4-

        strip-search case [Mack], Gertner held just the
        opposite opinion.

Id.  The article then noted that "Gertner could not be reached for

comment."  Id.

        In a July 28, 2000 letter to the Herald (with copies sent to

both parties), Judge Gertner responded to what she viewed as

inaccuracies in the July 26 article.  She noted, correctly, that she

had not denied class certification, but had postponed ruling on class

certification until further discovery had occurred.  She also noted

that, as of the date of the reporter's interview with counsel, counsel

for petitioners had not yet filed the motion in question.[4]  She included

with the letter a copy of her procedural order providing for a hearing

on class certification after the issue of standing had been resolved.

        On August 4, 2000, the Herald published a follow-up article,

which, based on a telephone interview with Judge Gertner, quoted her as

saying:

        In the [Mack] case, there was no issue as to
        whether [the plaintiffs] were injured.  It was
        absolutely clear every woman had a claim.  This
        is a more complex case.

Dave Wedge, Race-based Admissions Case To Be Heard, Boston Herald,

August 4, 2000, at 24.  It is not entirely clear from the record

whether Judge Gertner called the Herald reporter, or merely returned an

---

[4]  The motion was not filed until July 26 at 12:20 p.m., after that
day's edition of the Herald had been published, and accordingly after
the interview reported in that edition had taken place.

outstanding phone call, neither party was made aware of her comments prior to their August 4 publication.  See Boston's Children First v. City of Boston, 123 F. Supp. 2d 34, 36 (D. Mass 2000) [hereinafter Boston's Children, Motion to Recuse] ("[W]hen asked about the source of counsel's criticism . . . I noted that the cases were different, the school case 'more complex.'").

Based on Judge Gertner's comments as reported in the August 4 article, petitioners then moved that the judge recuse herself because her "impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  Specifically, petitioners claimed that the ex parte conversation between Judge Gertner and the Herald reporter, in which she described the current proceeding as "more complex" than Mack, was "specifically proscribed by the Code of Judicial Conduct," constituted a comment on the merits of a pending motion, and meant that the court had "placed itself in the apparent position of advising the defendants."

Judge Gertner denied the motion.  Boston's Children, Motion to Recuse, 123 F. Supp. 2d at 36.  She acknowledged that she had made the reported statements, characterizing them as attempts to correct a record suffering from gross misrepresentation by counsel for the petitioners.  Id.  She noted that "[n]othing in the Code of Judicial Conduct" made such a correction improper; moreover, that it was her "obligation to make certain that people receive accurate information regarding the proceedings over which [she] preside[s]."  Id. at 37.  As

to the specific comment about the complexity of the instant case, Judge

Gertner admitted that a conversation had taken place, but said:

> My comments in court, in the myriad decisions
> since the inception of the case, reflected
> precisely that theme--that the case raised
> complex questions of standing and liability, and
> that it deserved careful and thoughtful
> consideration.

Id. at 36. As a result, Judge Gertner concluded that she had simply

complied with the judicial canon allowing judges to explain "for public

information the procedures of the court." Id. at 37.


**DISCUSSION**

We begin, as we must, with the statute. Section 455(a)

requires "[a]ny justice, judge or magistrate of the United States [to]

disqualify himself in any proceeding in which his impartiality might

reasonably be questioned." This statute seeks to balance two competing

policy considerations: first, that "courts must not only be, but seem

to be, free of bias or prejudice," In re United States, 158 F.3d 26, 30

(1st Cir. 1998) (quoting In re United States, 666 F.2d 690, 694 (1st

Cir. 1981)); and second, the fear that recusal on demand would provide

litigants with a veto against unwanted judges, id. We have thus

considered disqualification appropriate only when the charge is

supported by a factual basis,[5] and when the facts asserted "provide what

---

[5] We have refused to require recusal based on misrepresentations or
falsehoods made by third parties, even when such falsehoods are widely

an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality." In re United States, 666 F.2d at 695. Moreover, we allow district court judges a "range of discretion" in the decision not to recuse. Id. However, we note that the district court should exercise that discretion with the understanding that, "if the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal." Nichols v. Alley, 71 F.3d 347, 352 (10th Cir. 1995).

Moreover, a petition for a writ of mandamus raises additional hurdles for the party seeking recusal. We have held that at least "[w]hen the issue of partiality has been broadly publicized, and the claim of bias cannot be labeled as frivolous," In re United States, 666 F.2d at 694, judicial disqualification may be one of the "unusual situations" appropriate for the writ, In re Martínez-Cátala, 129 F.3d 213, 217 (1st Cir. 1997). Even when such an unusual situation exists, however, we have counseled that the jurisprudence of mandamus requires that "an applicant for the writ . . . show both that there is a clear entitlement to the relief requested, and that irreparable harm will likely occur if the writ is withheld." In re United States, 158 F.3d at 30 (quoting In re Cargill, Inc., 66 F.3d 1256, 1260 n.5 (1st Cir.

---

reported and might theoretically cause the "appearance of partiality." See In re United States, 666 F.2d at 695. Because Judge Gertner has acknowledged that she made the statement at issue here, the factual basis of the allegations is not under challenge. The only question here is whether that basis is sufficient to mandate recusal.

1995)).  Mandamus thus requires "a case not merely close to the line, but clearly over it."  Martínez-Cátala, 129 F.3d at 218.[6]

The crux of petitioner's complaint is that Judge Gertner's statement – that the present case is "more complex" than Mack because in Mack "there was no issue as to whether [the plaintiffs] were injured" – could be construed as a comment on the merits of the pending motions for preliminary injunction and class certification.  In other words, by calling this case "more complex," Judge Gertner arguably suggested that the petitioner's claims for certification and temporary injunctive relief were less than meritorious; by comparing the case (less than favorably) to Mack, Judge Gertner signaled that relief was unlikely to be forthcoming.  Petitioners also argue that Gertner's comments provided defendants with a ready-made argument with which to distinguish the instant case from Mack.[7]  Given that Judge Gertner's

---

[6] We note that in a Government petition for mandamus in a criminal case, these concerns have been found less pressing because of the possibility that, absent the writ, double jeopardy considerations will eliminate any avenue of appeal.  In re United States, 158 F.3d at 30-31.  That is clearly not the case here, in a civil action allowing the full slate of appellate remedies upon a final judgment.

[7] This last argument is somewhat of a stretch.  Attempts to distinguish cases are basic litigation strategy, and, in fact, defendants had already suggested this particular distinction in earlier motions.  See, e.g., Boston's Children, Standing Order, 98 F. Supp. 2d at 113.

We also note that petitioners, in their appellate brief and in oral argument, spent significant time discussing the procedural history of the case and detailing the rulings against them which (in their opinion) are suggestive of bias.  We reject this argument: not only did Judge Gertner provide ample legal support for every decision issued in

comments <u>could</u> be construed in this context, petitioners argue that regardless of her intent,[8] the appearance of partiality created by her public statement required her to recuse herself pursuant to § 455(a).

Although Canon 3(A)(6) of the Code of Judicial Conduct instructs that "[a] judge should avoid public comment on the merits of a pending or impending action," it does not extend this proscription to "public statements made in the course of the judge's official duties, to the explanation of court procedures, or to a scholarly presentation made for purposes of legal education." 175 F.R.D. 364, 367 (1998). The commentary to the Code also "counsels that 'particular care' be taken" if a case from the judge's own court is involved, so that the comment "does not denigrate public confidence in the integrity and impartiality of the judiciary in violation of Canon 2A." <u>Id.</u> at 370-71.

Although the "goal sought to be served by the Canon informs our analysis," we do not decide the case solely on that basis. <u>United States</u> v. <u>Cooley</u>, 1 F.3d 985, 995 n.8 (10th Cir. 1993). First, it is

---

this case, but "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion . . . . Almost invariably, they are proper grounds for appeal, not for recusal." <u>Liteky</u> v. <u>United States</u>, 510 U.S. 540, 555 (1994). This may be true even when the judicial rulings in question are erroneous. <u>In the Matter of Sheffield</u>, 465 So.2d 350, 357 (Ala. 1985).

[8] In her memorandum refusing recusal, Judge Gertner has characterized her aims as explanatory and educational. <u>Boston's Children</u>, Motion to Recuse, 123 F. Supp. 2d at 37.

not at all clear that Judge Gertner was commenting on the merits of petitioner's motion. She understood her own comments as entirely ethical explanations of the reasons behind court procedures. Judge Gertner felt, reasonably, that such explanation was warranted given the likelihood that the Herald's readers would misunderstand the procedurally complex issues of standing and class certification - issues particularly difficult for those not legally trained. See Boston's Children, Motion to Recuse, 123 F. Supp. 2d at 37 ("Rather, I chose to correct the record. Nothing in the Code of Judicial Conduct suggests that I may not do so."). Second, both this Court and other courts have indicated that the Code of Judicial Conduct does not overlap perfectly with § 455(a): it is possible to violate the Code without creating an appearance of partiality; likewise, it is possible for a judge to comply with the Code yet still be required to recuse herself. See In re Cargill, 66 F.3d at 1262 n.5 (not deciding the point, but noting the "strong argument" that "not all instances of noncompliance" with the Code require automatic disqualification); In re Barry, 946 F.2d 913, 914 (D.C. Cir. 1991) (per curiam). But see id. at 916 (Edwards, J., dissenting) (suggesting that breach of this canon "will almost always give rise to a legitimate claim for disqualification under section 455(a)"). Third, we must consider the comments in the context in which they were issued: as a response to statements by counsel that were, at minimum, provocative attempts to

influence public opinion, and that could have been considered misrepresentations that potentially violated professional ethics. Cf. Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1460 (noting importance of context of statements, both within the course of individual litigation and with reference to the history of underlying subject matter).

We have little guidance on when public comments, even those on the merits of a pending action, create an appearance of partiality for which § 455(a) recusal is the appropriate remedy.[9] Judges are generally loath to discuss pending proceedings with the media, even when litigants may have engaged in misrepresentation. See Cooley, 1 F.3d at 995 ("[Discussing the case with the media] was an unusual thing for a judge to do."). Thus few reported cases deal with recusal on this basis. The Tenth Circuit has provided at least one example of when media contact mandated judicial disqualification. In Cooley, a federal district judge who had issued a preliminary injunction preventing abortion protesters from blocking a Kansas clinic "became 'adamant and vocal' in stating that his order was going to be obeyed" upon learning that protesters intended to willfully violate his orders.

_____

[9] In contrast, myriad cases indicate that courts are loath to require recusal based on statements made in a judicial context (e.g., in a status hearing or a decision rendered from the bench), even when such statements might suggest, to some extent, pre-determination of the merits. See, e.g., United States v. Grinnell, 384 U.S. 563, 581-82 (1966); United States v. López, 944 F.2d 33, 37 (1st Cir. 1991).

Id. at 988.  As part of his "campaign" to ensure that his orders would be enforced, the judge appeared on "Nightline," where he stated that "these people are breaking the law."  Id. at 990.  Five defendants arrested for blocking access to the clinic sought recusal of the district court judge, which he refused to grant.

The Tenth Circuit noted that, in refusing to grant the motion for recusal, the district court had maintained that it "knew nothing about the facts of [the defendants'] cases, and had no predisposition as to their guilt or innocence of the charges."  Id. at 995.  The court of appeals saw no reason to find otherwise.  Id. at 996 ("[T]he record of the proceedings below . . . discloses no bias.  To the contrary, it appears that the district judge was courteous to the defendants and sedulously protected their rights.").  But the court continued to explain why recusal was necessary nonetheless:

> § 455(a) asks a broader question which, on these facts, makes it impossible to take these cases out of context. . . .
>
> Two messages were conveyed by the judge's appearance on national television in the midst of these events.  One message consisted of the words actually spoken regarding the protesters' apparent plan to bar access to the clinics, and the judge's resolve to see his order prohibiting such actions enforced.  The other was the judge's expressive conduct in deliberately making the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him.  Together, these messages unmistakably conveyed an uncommon interest and degree of personal involvement in

-13-

> the subject matter. It was an unusual thing for a judge to do, and it unavoidably created the appearance that the judge had become an active participant in bringing law and order to bear on the protesters, rather than remaining as a detached adjudicator.
>
> We conclude that at least after the judge's volunteer appearance on national television to state his views regarding the ongoing protests, the protesters, and his determination that his injunction was going to be obeyed, a reasonable person would harbor a justified doubt as to his impartiality in the case involving these defendants.

Id. at 995.

Although the media contact in this case was less inflammatory than that in Cooley, we see the same factors at work, albeit on a smaller scale. First, the Boston school assignment program is a matter of significant local concern, generating at least two prominent articles in the Boston Herald. Judge Gertner viewed this prominence as all the more reason to correct misrepresentations by petitioners' counsel. However, Cooley counsels that in newsworthy cases where tensions may be high, judges should be particularly cautious about commenting on pending litigation. Interested members of the public might well consider Judge Gertner's actions as expressing an undue degree of interest in the case, and thus pay special attention to the language of her comments. With such public attention to a matter, even ambiguous comments may create the appearance of impropriety that § 455(a) is designed to address. In fact, the very rarity of such

-14-

public statements, and the ease with which they may be avoided, make it more likely that a reasonable person will interpret such statements as evidence of bias.  See In re Allied Signal Inc., 891 F.2d 967, 971 (1st Cir. 1989) ("[O]ther things being equal, the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality.").

Second, the "appearance of partiality" at issue here, as in Cooley, stems from the real possibility that a judge's statements may be misinterpreted because of the ambiguity of those statements.  In both cases, the judge's public comments could easily be characterized as legitimate efforts to explain operative law.  For example, the judge in Cooley could be understood merely as reminding potential law-breakers of the binding nature of a judicial order, and the potential for punishment that may accrue upon its violation.  Similarly, Judge Gertner's comments can be understood as a reflection of language in her prior orders, i.e., that class certification could not yet issue because the standing questions were more difficult ("more complex") than those in Mack.  Still, in both cases the comments were sufficiently open to misinterpretation so as to create the appearance of partiality, even when no actual prejudice or bias existed.  In Cooley, a reasonable person might interpret the comments as an affirmative effort to enforce the law, and an indication that a guilty

verdict would be forthcoming.  Here, a reasonable person might interpret Judge Gertner's comments as a preview of a ruling on the merits of petitioner's motion for class certification, despite the fact that defendants had not yet filed a response to that motion.

Although the Tenth Circuit based its finding in Cooley on the district judge's "active participa[tion] in bringing law and order to bear on the protesters," other courts have agreed that under some circumstances a judge's defense of her own orders, prior to the resolution of appeal, may create the appearance of partiality. See, e.g., Broadman v. Comm'n on Judicial Performance, 18 Cal. 4th 1079, 1104 (Cal. 1998) ("By making public comments in an attempt to justify and defend his decisions while those decisions were pending on appeal, petitioner adopted the role of an advocate.  Such actions would appear to an objective observer to be 'prejudicial to public esteem for the judicial office.'").  To the extent that Judge Gertner's comments might be interpreted as a defense of her procedural approach to this litigation, this proscription is well taken.  We believe that this appearance of partiality created by defense of a judge's own orders is equally (if not more) troubling in the midst of litigation than when a case is remanded to a judge upon appeal.

The fact that Judge Gertner's comments were made in response to what could be characterized as an attack by counsel on the procedures of her court did not justify any comment by Judge Gertner

-16-

beyond an explanation of those procedures.  See In re Conard, 944 S.W.2d 191 (Mo. 1997) (holding that a statement as to charges possible against potential defendant "reflected a pre-judging of the merits of criminal charges that might have been filed . . . [and] was not justified by the attacks [on the court]"); Sheffield, 465 So.2d at 354 (concerning a judicial response to a letter, criticizing the court, which appeared to have been "unfounded and factually incorrect"). Whether counsel for petitioners misrepresented the facts or not is irrelevant: the issue here is whether a reasonable person could have interpreted Judge Gertner's comments as doing more than correcting those misrepresentations and creating an appearance of partiality. We feel that, on these facts, a reasonable person could do so.

Again, we underscore that this ruling in no way intimates any actual bias or prejudice on the part of Judge Gertner. See In re Sch. Asbestos Lit., 977 F.2d 764, 782 (3d Cir. 1992). "The problem, however, is that regardless of [a judge's] actual impartiality, a reasonable person might perceive bias to exist, and this cannot be permitted." Id. "Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their best to weigh the scales of justice equally between contending parties." In re Murchison, 349 U.S. 133, 136 (1955). We have every confidence that Judge Gertner is one such judge. "But to perform its high function in

the best way, 'justice must satisfy the appearance of justice,'" <u>id.</u>,
and thus we must grant the writ.

**Writ of mandamus granted.**